**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

EDDIE MADDOX, AIS 246621,       :

     Plaintiff,              :

vs.                        :      CIVIL ACTION NO. 13-00121-KD-C

COI GIPSON, *et al.*,         :

     Defendants.           :

## <u>ORDER</u>

This cause is before the Court on the motion for summary judgment filed by defendants Anthony Gipson, Christopher Kimbrel, and Ernest Stanton (Doc. 19; *see also* Doc. 20 (conversion order))[1], and plaintiff's response in opposition (Doc. 21). Upon consideration of the foregoing pleadings, and all other relevant pleadings in this file, the motion for summary judgment is **GRANTED** and plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## <u>FACTUAL BACKGROUND</u>

Officer Anthony Gipson was making rounds with the library law clerk in the segregation unit[2] of Holman Correctional Facility on December 15, 2011—between 11:00

---

[1]     The Special Report (Doc. 19) that was converted by Order (Doc. 20), applies only to Correctional Sergeant Anthony Gipson, Correctional Sergeant Chris Kimbrel, and Correctional Officer Ernest Stanton (*see* Doc. 19). A fourth defendant named in the complaint, Correctional Officer Joel Broadhead, was never served and is not a party to this action. (*Compare* Doc. 7 (plaintiff's motion to compel) *with* Doc. 26 (endorsed order denying motion to compel with respect to COI Broadhead because "a sufficient claim" had "not been supported so as to require service.").)

[2]     The segregation unit is a single cell unit that operates on a 23-hour lockdown schedule. (Doc. 1, at 7; *see also* Alabama Department of Corrections, *Holman Correctional Facility*, available at http://www.doc.alabama.gov/facility.aspx?loc=33 (last visited February 14, 2014).)

p.m. and 11:30 p.m.—when he "observed a magazine on the tier between inmate [and plaintiff, Eddie] Maddox's cell and the next cell." (Doc. 19, Exhibit B, Affidavit of Anthony Gipson, at 1; *see also* Doc. 1 at 7 (Maddox's admits that he "had a magazine outside his cell").)  As Gipson was taking the magazine into his possession, Maddox informed the officer that he was just in the process of passing the magazine to the inmate in the neighboring cell. (Doc. 19, Exh. B, Gipson aff., at 2.) Maddox's comment prompted Gibson to remind the inmate of the rules he signed upon being processed into the segregation unit, specifically the following: "'You are not allowed to pass items from one cell to another at any time. This includes passing items in person or by use of strings or officers. Items you attempt to pass will be confiscated and destroyed.'" (*Id.*) Thereafter, Maddox and Gipson engaged in an unpleasant, albeit brief, verbal exchange. (*Compare id. with* Doc 1, at 7.)

After finishing his rounds with the library clerk, Gipson informed his supervisor, Sergeant Christopher Kimbrel, of the incident. (Doc. 19, Exh. B, Gipson aff., at 2.)  During this conversation, Gipson noticed that the magazine he had confiscated from Maddox was more than thirty (30) days old, making it contraband under Holman's Standard Operating Procedure ("SOP") #9-12.[3]  (*Id.*)  As a result of Maddox being in possession of contraband, Kimbrel instructed Gipson, as well as Officers Joel Broadhead and Earnest

---

[3]         "[T]he SOP (Standard Operating Procedure) number 9-12 states, 'Newspapers over seven (7) days old and magazines over thirty (30) days old will be considered contraband. They are unauthorized and will be confiscated and destroyed.'" (*Id.*)

Stanton, "to conduct a shakedown on inmate Maddox's cell for further contraband." (*Id.*)[4]

At approximately 11:30 p.m., Officers Gipson, Broadhead, and Stanton went to search Maddox's cell for contraband. (*Compare* Doc. 19, Exhibit A, Affidavit of Chris Kimbrel, at 1 *with* Doc. 19, Exhibit E, Incident Report.) Upon arrival, Gipson gave Maddox a direct order to place his hands through the tray door to be handcuffed for a shakedown. (Doc. 19, Exh. B, Gipson aff., at 2; *see also* Doc. 1, at 7.) Although the allegations in the complaint reflect that Maddox immediately complied with Gipson's order (*see id.*), it is clear that this is not what happened as the complaint was penned by a writ writer with no direct knowledge of the incident (*compare* Doc. 1, at 7-10 (handwriting) *with* Doc. 19, Exhibit F, at 6 (Maddox's handwritten statement attached to Disciplinary Report reflecting different handwriting)) and Maddox's own December 16, 2011 written statement reflects that he initially refused to "cuff up" until a supervisor was present (*see id.* ("They being getting people in handcuff[s] [and then] jump on them[.]")). Indeed, Maddox refused several direct orders given by Gipson to place his hands through the tray door to be handcuffed, yelling "'Y'all ain't coming up in my cell!'" (Doc. 19, Exh. B, Gipson aff., at 2.) In light of Maddox's refusal to comply with his orders, Gipson contacted Sgt. Kimbrel on the facility's in-house radio (*compare id. with* Doc. 19, Exhibit E, Incident Report); when Kimbrel arrived on scene, he gave Maddox several direct orders to "cuff up" (Doc. 19, Exh. A, Kimbrel aff., at 1). When Maddox

---

[4]     Thus, the shakedown of Maddox's cell was not "random" as is indicated in the December 15, 2011 Incident Report and Duty Officer Report. (*Compare id. with* Doc. 19, Exhibit E, Incident Report and Duty Officer Report.)

refused those orders, Kimbrel "administered a one-second burst of the chemical agent [Saber Red]" to Maddox's facial area. (*Id*. at 1-2; *see also* Doc. 19, Exh. B, Gibson aff., at 3; *see* Doc. 19, Exh. F, Disciplinary Report, at 2 (inmate Ferman Williams testified that "'Sgt. Kimbrel told [Maddox] to cuff-up and Eddie asked for what and Sgt. Kimbrel sprayed him.'").) Only then did Maddox comply with another direct order from Kimbrel to "cuff up" and, upon exiting the cell, he was escorted to the Health Care Unit for medical assessment. (Doc. 19, Exh. A, Kimbrel aff., at 2; *see also* Doc. 19, Exh. B, Gibson aff., at 3.) And while Maddox's complaint contains the allegation that he was sprayed with the chemical agent "while handcuffed inside his [locked] cell" (Doc. 1, at 7), the handwritten statement he provided during the course of disciplinary proceedings establishes the falsity of such allegation (*see* Doc. 19, Exhibit F, at 6 ("A supervisor Sgt. walk up and told me to cuff up[.] I said alright. And I was trying to get him [to] make sure the police don't jump me once I put the handcuff[s] on and while I was talking to him he just spray[ed] me and I was like dam[n] why you do that f[o]r;[] I told you I was *going* to cuff up.")), as does the contrary affidavit testimony of the defendants (*see* Doc. 19, Exhibits A-C.). More importantly, nowhere in his rebuttal affidavit does plaintiff again take the position that he was sprayed while handcuffed or otherwise contradict the testimony of the defendants regarding the facts which led to Kimbrel administering a one-second burst of pepper spray. (*See* Doc. 21.)

Maddox also alleges that he did not receive adequate medical care, after being sprayed with the chemical agent, which rises to the level of deliberate indifference by the defendants in direct violation of 42 U.S.C. § 1983. (*Compare* Doc. 1 *with* Doc. 21, at 2 & 5-7.) Medical records, the incident and disciplinary reports, and affidavits supplied in this case reflect that immediate action was taken to provide Maddox with medical attention

after the chemical agent was administered. (*Compare* Doc. 19, Exh. A, Kimbrel aff., at 2 *with* Doc. 19, Exh. E, at 5, ADOC Body Chart dated December 15, 2011.)  At 11:50 p.m., just minutes after Kimbrel first reported to Maddox's cell, Maddox was evaluated. (*Id.*) Nurse Jernigan's evaluation found Maddox "A&Ox3.[5] Resp even & non[-]labored. No S/S of distress noted. [No] lacerations noted. [No] redness, tearing or c/o burning noted to eyes. [No] c/o pain noted." (*Id.* (footnote added)*; see also* Doc. 19, Exh. D, Ferrell aff., at 2.)[6] While there is no explicit mention in the medical records, or in the affidavit supplied by the medical director, that Maddox received a decontamination shower at this time, or that one was needed (*compare id.* ("[P]lan implemented was[:] release to the Department of Corrections[]" and the "[i]nstructions provided to inmate Maddox by the nurse were[:] Return to the HCU (health care unit) as needed.") *with* Doc. 19, Exhibit E, Body Chart)), it is clear that decontamination occurred in the form of plaintiff's eyes and face being cleaned/flushed (*compare* Doc. 21, at 4 (plaintiff's affidavit statement that his eyes were cleaned out in the infirmary) *with* Doc. 19, Exhibit A, at 2 ("I then escorted inmate Maddox to the Health Care Unit for a medical assessment and decontamination which was conducted by Corizon Medical Services' Licensed Practical Nurse, Rebecca Jernigan. Once the medical evaluation and decontamination was completed, I escorted inmate Maddox from the Health Care Unit back to his assigned cell.")), and the photographs taken of Maddox immediately after Jernigan's evaluation reflect absolutely

---

[5]  This literally is shorthand for alert and oriented times three. (Doc. 19, Exhibit D, Affidavit of Laura Ferrell, at 2.)

[6]  Laura Ferrell is the Director of Medical Services for the office of Health Services, Alabama Department of Corrections. (*Id.* at 1.)

no redness (or discoloration) of the eyes, face, or upper body of Maddox as would be expected if the inmate was indeed continuing to labor under the effects of the chemical agent (*see* Doc. 19, Exh. E, at 6-7).[7] Therefore, the allegation in the complaint that plaintiff "was taken out of the cell and taken to the medical infirmary for a body chart that was done by Nurse Langford [] who notice[d] the mace all over the plaintiff and gave a medical decision state[d] to the defendants that the plaintiff should be put in a shower," (Doc. 1, at 7), is contradicted not only by the aforementioned photographs and cleaning/flushing of the eyes and face but, as well, by the clear evidence that Langford did not complete the body chart and nothing on that form reflects that the nurse who did complete the form—Jernigan—observed mace all over plaintiff's body and ordered a decontamination shower (*see* Doc. 19, Exhibit E, at 5, Body Chart). Moreover, Maddox's rebuttal affidavit simply makes conclusory statements, including the following: "Defendants can not 'state' in good faith that the spray does not cause burning pain, or that dried chemical agent spray does not reinact (sic) when water is applied, defendants knew or should have know that [he] w[as] in need of a shower for decontamination purposes." (Doc. 21, at 7; *see id.* at 4 ("Defendants can not in good faith[] deny that the chemical agent mace will burn the body when left on the body over 24 hours . . . Defendants can not reasonably object to inmates needs for decontamination showers when their chemical agent mace spray are applied to the inmates.")). In other words, the

---

[7]     Indeed, these photographs reflect that plaintiff was in no distress at the time they were taken; in one photograph, plaintiff looked straight into the camera and is the picture of health. (*Id.*) There is certainly no evidence that plaintiff had pepper spray all over his body. (*See id.*)

affidavit does not provide the undersigned with any helpful evidence regarding the defendants' subjective intentions in this regard.

The complaint also contains allegations that after the photographs were taken in the segregation processing room (*see* Doc. 19, Exh. E., at 6-7), the defendants "cut off the lights and started stumping the plaintiff to the ground stumping the plaintiff in the head, face which chipped the plaintiff's front teeth. After the beating the plaintiff the defendants took the plaintiff back to his cell without any other medical attention." (Doc. 1, at 7-8; *but cf.* Doc. 19, Exh. A, Kimbrel aff., at 2 ("Inmate Maddox claims that I took pictures of Inmate Maddox and then turned out the lights so that inmate Maddox could be beaten. This is completely false. I was with inmate Maddox from the time I arrived at his cell until the time he was placed back in his cell. Inmate Maddox was not beaten nor was any force used on inmate Maddox other than the chemical agents as previously stated.").) In addition to Sgt. Kimbrel's direct denials of this additional assault (*see id.*), there is no mention anywhere in the incident report, use of force investigative report, or disciplinary records of this alleged physical assault, even though Maddox provided a handwritten statement regarding the events that happened that night for inclusion in both the investigative report and the disciplinary report. (*See* Doc. 19, Exh. E, at 10, Use of Force Inmate Written Statement; Doc. 19, Exh. F, Disciplinary Report, at 6.)[8] Moreover,

---

[8]     On December 16, 2011, Captain James Powers opened a "Use of Force Investigation."( Doc. 19, Exh. E, Investigative Report, at 8.) Powers concluded that Kimbrel's use of a chemical agent on Maddox "was justified" in order "to get inmate Maddox to comply with the orders given[.]" (*Id.*) Later that day, on December 16, 2011, Kimbrel charged Maddox with violating Administrative Regulation 403—specifically Rule #56—for failing to obey a direct order. (Doc. 19, Exhibit F.)

        On 12/15/2011, Correctional Sergeant Chris Kimbrel gave inmate Eddie
        Maddox B/246621 numerous direct orders to place his (Maddox) hands outside
(Continued)

there is nothing in plaintiff's medical records from this time—that is, starting on December 15, 2011 and running to December 20, 2011—which references any treatment for chipped front teeth or abrasions to the head and face caused by "stumping" by the defendants. (*See* Doc. 19, Exhibit G, at 236-240.)[9] The one page of the medical records plaintiff points to—in rebuttal—as establishing that his teeth and gold crowns were damaged—requiring replacement—by these defendants on December 15, 2011, is a

---

the tray door of his (Maddox) cell (L-46) so that handcuffs could be applied so that inmate Maddox's person and cell could be search[ed]. Inmate Maddox refused. Chemical Agents were administered to gain compliance from inmate Maddox. This is a Use of Force incident.

(*Id*.) That same day, Maddox was served with a copy of the disciplinary report which advised him that his hearing was set for December 23, 2011 at 12:50 a.m. in the segregation shift office. (Id.) Maddox pled not guilty and listed as witnesses, inmates Ferman Williams, Bobby Shamburger, and Lindsay Darby. (Id.) One of Maddox's witnesses refused to testify. At the hearing, Kimbrel testified, consistent with the charging document, that he gave Maddox a direct order to cuff-up and that the inmate refused that direct order. (*Id*. at 3.) In addition, one of Maddox's witnesses heard Kimbrel tell Maddox to cuff-up and "Eddie asked for what and Sgt. Kimbrel sprayed him." (*Id*. at 2.) Further, Maddox's own statement to the disciplinary hearing officer supports a finding that Maddox refused to cuff-up:

I was standing at [the] door [to my cell.] . . . My book was in the hallway. Officer Gipson took my book. I ask him why he [was] tak[]ing it[.] [H]e said fuck you nigga[.] Fuck you bitch[.] All the inmate[s] in lockup heard this[.] I said fuck you bitch. Then they came back 30 minute[s] later and said shakedown[.] They being getting people in handcuff[s and] jump on them so I ask for a supervisor[.] Sgt walk up and told me to cuff up[.] I said alright. And I was trying to get him [to] make sure the police don't jump me once I put the handcuff[s] on and while I was talking to him he just spray me and I was like [damn] why you do that f[o]r. *I told you I was going to cuff-up.*

(*Id*. at 6 (emphasis added).) The hearing officer, Correctional Sergeant Theresa Moore, concluded that Maddox violated Administrative Regulation 403's Rule 56 by failing to obey a direct order from Kimbrel to cuff-up. (*Id*. at 3.)

---

[9] On December 20, 2011, plaintiff did request referral to the dentist because his teeth were hurting and he was referred to the dental department; however, plaintiff nowhere indicates that his teeth were hurting because of the actions of the defendants in physically assaulting him on December 15, 2011. (*See id*. at 236.)

March 15, 2012 consent for dental treatment reflecting only that the dentist smoothed the rough edge of Tooth Number 8. (*Compare* Doc. 21, at 3 *with* Doc. 19, Exhibit G, at 157.) Not only does nothing about this entry substantiate plaintiff's conclusory claims that the defendants' injured his front teeth on December 15, 2011, other dental records reflect that Maddox reported to the dentist on December 28, 2011 that he "'[l]ost [his] gold upper front teeth [8 & 9.]'" (*Id*. at 164.)[10] Because those two front teeth had caries, plaintiff was scheduled for possible restoration, after it was explained to Maddox that "Crown & Bridge cosmetic dentistry" was not performed at Holman. (*Id*.) Still other dental records reveal that on January 3, 2012, plaintiff's "open-faced gold crowns" and #8 and #9 were cleaned and replaced and the teeth etched and bonded; in addition, composites were done on those teeth on April 24, 2012. (*See id*. at 158-160.)

Finally, plaintiff contends that as a result of the defendants' failure to give him a decontamination shower, he suffered "ongoing burning of the body from over night mace that resulted in a long line of seeking medical care[.]" (Doc. 1, at 9; *see also* Doc. 21, at 5 (plaintiff's allegations that medical records reflect ongoing skin problems he suffered as a result of having to try to clear off the mace himself in his segregation cell and "moving" the mace to other parts of his body)). There is certainly evidence in the record that within hours of being returned to his cell, Maddox filed two separate health services request forms complaining of continued burning over parts of his body and blurry vision. (Doc. 19, Exh. G, at 237-238.) These request forms were received by the Health Care Unit at 3:00 a.m., on December 16, 2011; however, plaintiff was not triaged by a

---

[10]     Indeed, two months earlier, Maddox was complaining that Teeth 8 & 9 were sensitive, and heavy wear was noted at that time by the dentist. (*Id*.)

registered nurse until some thirteen (13) plus hours later, at 4:50 p.m. (*Id.*) The record is silent as to why it took so long for Maddox to be allowed to be evaluated.[11]  (*See* Doc. 19.) Nevertheless, by the time Nurse Nettles evaluated plaintiff, his only complaints consisted of "burning" eyes and "blurry vision" (Doc. 19, Exh. G, at 239); it was noted that plaintiff was decontaminated the previous day (*id.*). The objective findings of Nurse Nettles reflect no "swelling", "rash", "lesion", "redness" or any other "trauma" to the skin and no "significant difference from previous [eye] exam" (*id.* at 239). Nonetheless, plaintiff was referred to an eye doctor (*id.* at 240) because of signs of pain/tenderness in the eyes, that is, alteration in comfort; a referral to the eye doctor was ordered at this time (*id.* at 239 & 240) Plaintiff was initially seen on December 21, 2011, but had to be rescheduled for an eye exam due to an inability "to see" (Doc. 19, Exh. G, at 175); on examination conducted on January 18, 2012, plaintiff's eyes were dilated and no chemical side effects were noted by the optometrist (*id.* at 174).

Despite only complaining about eye discomfort and blurry vision to Nurse Nettles on December 16, 2011, Maddox alleges that he has suffered an ongoing harm as a result of the defendants' failure to properly decontaminate him after exposing him to a chemical agent. (Doc. 21, at 5.)  In support of this allegation, Maddox claims that the first complaint of the ongoing problem can be found in "Exhibit G at page 237" and continues until October 2012 as demonstrated on pages 17-18. (Doc. 21, at 5.) Page 237 of Exhibit G, as reflected above, is nothing more than the health services request form submitted by

---

[11]     It is Maddox's contention that the prison guards, and not the medical personnel, are responsible for it taking over 16 hours for Maddox to be reevaluated by health services. (*See* Doc. 1, at 8.)  However, there is no mention in the record as to which guards were still on duty at the time that Maddox alleges he was denied access to additional medical attention.

plaintiff on December 16, 2011, that states "I['ve been] spray[ed] all over with [mace.] [M]y ass burning[,] my dick burning[,] face[,] neck[,] arm[,] everywhere." (Doc. 19, Exh. G, at 237.) And pages 17 and 18 are nursing protocol sheets, dated February 4, 2013 and February 20, 2013, the first of which reflects plaintiff's complaints of "jock itch" present since October of 2012[12] (Doc. 19, Exh. G, at 18) and the second of which merely reflects that steri strips were applied to a laceration and a Tetanus shot administered (*id.* at 17). Nothing from the records cited by plaintiff support an allegation that he suffered any ongoing skin problems because of the administration of mace on December 15, 2011; instead, these records point to other underlying causes of plaintiff's discomfort on February 4, 2013 and February 20, 2013, namely, jock itch and a laceration.

## CONCLUSIONS OF LAW

### A. Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009)

---

[12] In fact, there is evidence in the medical records provided this Court that Maddox first complained of jock itch on December 1, 2011 (*compare* Doc. 19, Exh. G, at 245-246 (first complaint about bumps on groin dated December 1, 2011) *with id.* at 242 ("I have a jock itch that won['t] clear up[.] The cream you gave me [on December 1, 2011] . . . [is] no good it worster (sic). I need medicine to dry this up between my legs[.]")), fourteen days prior to being sprayed with mace.

("[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'").

The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Allen v. Board of Public Educ. for Bibb Cnty*, 495 F.3d 1306, 1313 (11th Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Once this initial demonstration is made, the "responsibility then devolves upon the non-movant to show the existence of a genuine issue . . . [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *see also Allen, supra*, at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and show by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'"); *see Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, '"depositions, answers to interrogatories, and admissions on file."'").

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not

> prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party."). In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Comer, supra*, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.").

In considering whether the defendants are entitled to summary judgment in this case, the Court has viewed the facts in the light most favorable to the plaintiff. *Comer, supra*, 265 F.3d at 1192 ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

*Garczynski, supra*, 573 F.3d at 1165 (internal citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp., supra,*

43 F.3d at 599. More importantly, where, as in this case, "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007); *see also Logan v. Smith*, 439 Fed. Appx. 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted)). [13]

## B. Plaintiff's Claims of Excessive Force.

Defendants Kimbrel, Gipson, and Stanton argue that they are entitled to judgment in their favor as it relates to plaintiff's claims of excessive force. In this regard, the Court will focus upon Kimbrel's administration of a one-second burst of a chemical agent/pepper spray—Sabre Red—to Maddox's facial area on December 15, 2011 (as well as plaintiff's arguments related to the alleged failure to give him a decontamination shower). Maddox's allegation that Kimbrel, Gipson, Stanton, and Broadhead (who is not a party to this action) "stomped" him in the face and head area (causing chipped front teeth) while plaintiff was in the segregation processing room is blatantly contradicted by the record. Specifically, Maddox's contemporaneous statement of the events of December 15, 2011, fail to mention this alleged "stomping" and the medical records of the day after fail to support any complaint related to this alleged "stomping". (*see* Doc.

---

[13] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

19, Exh. D, at 2-4; Exh. E, at 10; Exh. G, at 158, 164, 206 & 215-240). *Compare Scott, supra with Logan, supra.* Accordingly, the Court finds that "no reasonable jury could believe" that this alleged use of excessive force incident occurred. Summary judgment is due to be granted in favor of the defendants with respect to this claim.

Turning to plaintiff's excessive force claim asserted against Kimbrel, there can be no question but that the Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. *Campbell v. Sikes,* 169 F.3d 1353, 1374 (11th Cir. 1999); *see also Johnson v. Moody,* 206 Fed. Appx. 880, 883 (11th Cir. Oct. 31, 2006). In order to establish an Eighth Amendment excessive force claim against defendant Kimbrel regarding his administration of a one-second burst of Sabre Red pepper spray, plaintiff must prove both an objective and subjective component. That is, plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that Kimbrel "'act[ed] with a sufficiently culpable state of mind,'" i.e., that the defendant acted "maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 & 8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992) (citation omitted).

Subjectively, then, Maddox must establish that "force was applied . . . maliciously and sadistically to cause harm[,]" as opposed to being applied "in a good-faith effort to maintain or restore discipline[.]" *Hudson, supra,* 503 U.S. at 7, 112 S.Ct. at 999; *see also Whitley v. Albers,* 475 U.S. 312, 320-321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) ("[W]e think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"). In making this determination, the Court considers the need for the

application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts made to temper the severity of a forceful response, and the extent of injury suffered. *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999, *citing Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085; *see also, Campbell, supra,* 169 F.3d at 1375 ("*Hudson* and *Whitley* outline five distinct factors relevant to ascertaining whether force was used 'maliciously and sadistically for the very purpose of causing harm': (1) 'the extent of injury'; (2) 'the need for application of force'; (3) 'the relationship between that need and the amount of force used'; (4) 'any efforts made to temper the severity of a forceful response'; and (5) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.'").

In the instant case, there is simply insufficient evidence that would support a finding that Kimbrel used force "maliciously and sadistically" for the purpose of causing harm. First, there is no genuine issue of material fact that there was need for application of some force because of Maddox's refusal to follow Officer Gipson's numerous orders to "cuff up" so a shakedown of his cell could be conducted and his continued recalcitrance when ordered by Sgt. Kimbrel to "cuff up." *Compare Danley v. Allen,* 540 F.3d 1298, 1303 (11th Cir. 2008) ("[P]epper spray is an accepted non-lethal means of controlling unruly inmates . . . ."), *overruled on other grounds as recognized by Randall v. Scott,* 610 F.3d 701 (11th Cir. 2010), *with Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain. . . . The use of mace, tear gas or other chemical agent of the like nature when necessary . . . to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment. . . . The 'use of the substance [] in small

amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required.'"), *cert. denied,* 470 U.S. 1085, 105 S. Ct. 1846, 85 L. Ed. 2d 144 (1985). Second, given the need for force, the Court finds that the evidence is insufficient for a reasonable jury to find that the administration of a one-second burst of pepper (OC) spray was unreasonable, malicious or sadistic.

Third, the extent of the injury also in no way supports a reasonable finding that the force used was used maliciously and sadistically. *See Campbell, supra,* 169 F.3d at 1375. Maddox sustained only some burning of his eyes, which were admittedly flushed of the pepper spray on the date of the "injury." Indeed, by the time plaintiff's Body Chart was completed, he had no complaints whatsoever; there was no redness or tearing of the eyes noted and no complaints of burning of the eyes. And although Maddox complained of additional eye pain and blurry vision a few hours later,[14] examination by a nurse on December 16, 2011 revealed no problems other than pain and an eventual eye exam on January 18, 2012, revealed no chemical side effects to the eyes, that is, no injury to the eyes cause by the pepper spray.

_____

[14] Plaintiff's concomitant complaints of burning in the area of his crotch and buttocks were not relayed to the medical personnel when he was seen in the Health Care Unit the following day and, indeed, the examining nurse that day noted no swelling, rash, lesion, redness, or other trauma to the skin. Plaintiff's reliance upon these complaints (placed on a medical request form) and citation to two pages in the medical record as "evidence" of recurring problems due to being sprayed with the chemical agent is unavailing not simply because he did not relay such complaints to the examining nurse when later seen on December 16, 2011—and the nurse did not objectively note any problems with the skin—but, more importantly, because the pages of the medical record to which plaintiff cites—as well as other medical records—conclusively establish that his "crotch" malady was jock itch, not residuals of pepper spray some thirteen (13) months after the spraying incident.

Additionally, the fact that Kimbrel and other officers, including Gipson and Stanton, escorted Maddox to the Health Care Unit immediately after the administration of the pepper spray for treatment also undermines Maddox's unsupported allegation that Kimbrel's conduct was malicious or sadistic inasmuch as the officers took steps to immediately ensure that plaintiff received prompt treatment for his relatively minor injuries. Finally, it is important to note that in applying force there is no evidence that Kimbrel used threatening or abusive language. *See Bozeman v. Orum,* 422 F.3d 1265, 1271 n.11 (11th Cir. 2005) ("[T]hreatening language as part of a totality of circumstances can be relevant to what is constitutionally reasonable or, as in this case, to the determination of reasonable inferences about the Officers' subjective state of mind."). Based upon the foregoing, the Court finds that Maddox has failed to produce sufficient evidence for a reasonable jury to find that Kimbrel utilized force (that is, a one-second burst of pepper/OC spray) to "maliciously and sadistically to cause harm" as opposed to in an effort "to maintain or restore discipline." *Hudson, supra,* 503 U.S. at 7, 112 S. Ct. at 999; *Whitley, supra,* 475 U.S. at 320-321, 106 S. Ct. at 1085.[15]

------

[15]     This same analysis applies to plaintiff's "decontamination shower" argument, to the extent plaintiff means to argue—and it appears to the Court that he does mean to make this argument (*see* Doc. 1)—that the failure of the named defendants to give him a decontamination shower, on orders of a nurse, also establishes excessive use of force. Given the factual circumstances in this case, this Court finds that plaintiff's "decontamination shower" argument is a separate claim of excessive force as opposed to being akin to the facts in *Danley, supra,* which established "nearly simultaneous actions . . . [which were] interrelated parts of a single course of conduct, not separate events." 540 F. 3d at 1307; *see also id.* ("The use of the pepper spray against Danley immediately followed by confinement in a small, poorly ventilated cell, which enhanced the effects of the spray, is analogous to two blows in a beating."); *cf. Scroggins v. Davis,* 346 Fed.Appx. 504, 505 (11th Cir. Sept. 28, 2009) ("The use of one burst of oleoresin capsicum (O.C.) spray against Scroggins during the altercation was not excessive force. . . . Nor did placing Scroggins in four-point restraints for three hours and fifteen minutes amount to excessive force."), *cert. denied,* 559 U.S. 982, 130 S.Ct. 1711, 176 L.Ed.2d 197 (2010). Here, there was not a continuing application of force after plaintiff was subdued (that is, he was not confined in a (Continued)

Turning to the objective component, the undersigned notes that inherent in the protection afforded by the Eighth Amendment is the principle that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Clark v. Johnson*, 2000 WL 1568337, *12 (S.D. Ala. 2000), quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000. The objective component "of an Eighth Amendment excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort '"repugnant to the conscience of mankind."'" *Hudson*, 503 U.S. at 9-10, 112 S. Ct. at 1000 (citations omitted). While the

---

poorly-ventilated room immediately following the administration of a one-second burst of pepper spray to his face); instead, he was immediately taken to the Health Care Unit where his eyes and face were immediately cleaned and he was examined by a nurse. The Body Chart completed by the examining nurse contains no notation (or objective findings indicating) that Maddox needed further decontamination (by shower) nor do the photographs taken of plaintiff immediately following the examination betray any evidence of redness or irritation of plaintiff's skin—anywhere on his body—indicating the need for further decontamination. In addition, there is no evidence in this case of the kind in *Danley, supra*, that plaintiff screamed and cried out to the defendants about burning skin, etc., or evidence that the defendants laughed at his discomfort. *See Danley, supra,* 540 F.3d at 1304. Based upon the evidence that exists, the burden shifts to Maddox "to present 'evidence on which the jury could reasonably find for [him],' . . . on the issue of the defendants' subjective intentions" when they purportedly failed to give him a decontamination shower. In this regard, plaintiff simply makes several conclusory statements in his rebuttal affidavit, including that "[d]efendants can not 'state' in good faith that the spray does not cause burning pain, or that dried chemical agent spray does not reinact (sic) when water is applied, defendants knew or should have know that [he] w[as] in need of a shower for decontamination purposes." (*Id.; see id.* at 4 ("Defendants can not in good faith[] deny that the chemical agent mace will burn the body when left on the body over 24 hours . . . Defendants can not reasonably object to inmates needs for decontamination showers when their chemical agent mace spray are applied to the inmates.")). Not only is there no evidence in the record that any portion of plaintiff's body was "burned" but, most importantly, these conclusory statements do not bear upon whether the defendants "'sadistically and maliciously [failed to give plaintiff a decontamination shower] for the very purpose of causing harm.'" *Fischer, supra,* 238 Fed. Appx. at 432, quoting *Johnson, supra,* 280 F.3d at 1321. Accordingly, Maddox's failure to establish a genuine issue of material fact regarding the subjective prong of this alleged instance of excessive use of force warrants entry of summary judgment in favor of the defendants on this claim. *See Scroggins, supra,* 346 Fed. Appx. at 505 & 507 (finding that the district court properly granted summary judgment to the defendants on plaintiff's excessive force claims, namely, the use of one burst of O.C. spray and placement of plaintiff in four-point restraints for over three hours immediately after the spraying incident).

Supreme Court in *Hudson* did not define "*de minimis* use of force," it did hold that neither "serious" nor "significant" injury is required to satisfy the objective component of an Eighth Amendment claim, nor is any arbitrary quantum of injury an absolute requirement of an excessive force claim, apparently out of concerns that certain forms of torture are capable of inflicting extreme pain without leaving any mark or tangible injury." *See id.* at 9, 112 S.Ct. at 1000 ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."). Thus, the Eleventh Circuit requires "that the plaintiff suffer more than a *de minimis* injury, while being mindful that a significant injury is not required to establish an Eighth Amendment violation[.]" *Smith v. Vavoulis*, 373 Fed. Appx. 965, 966 (11th Cir. 2010) (internal citation omitted), citing *Hudson*, 503 U.S. at 8-10, 112 S. Ct. at 999-1001.  In so doing, the Eleventh Circuit stays true to *Hudson's* determination that "bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes." 503 U.S. at 10, 112 S.Ct. at 1000; *compare id. with Smith, supra,* 373 Fed. Appx. at 967 (burning caused by mace, bruises, bleeding from the mouth, a deep cut on the wrist and swelling, and "knots" on the head, all of which healed without medical treatment, found to be similar to the injuries described in *Hudson* and, therefore, not *de minimis*).

The alleged injuries suffered by Maddox are not similar to the ones described in *Hudson* and *Smith*; instead, they are *de minimis*. Maddox's eyes and face were immediately cleaned in the Health Care Unit after Kimbrel's administration of a one-second burst of pepper spray and while his eyes remained painful and blurry twelve hours after administration of the mace, a subsequent eye exam was normal and revealed no chemical side effects to the eyes, that is, no injury to the eyes cause by the pepper

spray. These *de minimis eye* injuries, as well as all other facts and circumstances heretofore explored, establish that Kimbrel's administration of a one-second burst of pepper spray into the area of plaintiff's face constitute no more than a *de minimis* use of force.[16] *Cf. Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010) ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.").

In light of plaintiff's inability to establish genuine issues of material fact regarding either prong of the excessive use of force analysis—as to either alleged instance of force—the defendants are entitled to judgment in their favor.

### C.    Deliberate Indifference and Deprivation of Treatment for a Serious Medical Need.

The undersigned appreciates Maddox's argument in this regard to be that the defendants were deliberately indifferent to a serious medical need by failing to ensure that he received a proper decontamination shower after being exposed to a chemical

---

[16]    As for the injuries plaintiff allegedly suffered as a result of the defendants' failure to give him a decontamination shower, the Court finds that although plaintiff complained of some burning in his crotch and buttocks areas a few hours after he was returned to his cell he made no mention of such complaints to the nurse who evaluated him some thirteen plus hours later (on December 16, 2011) and that nurse's objective findings reflect no problems whatsoever with Maddox's skin. Moreover, the medical records plaintiff cites to in support of his "decontamination shower" claim fail to reveal any evidence whatsoever that the pepper spray caused plaintiff to experience long-tem medical issues in the area of his crotch; instead, these records conclusively establish that plaintiff's "crotch" affliction was "jock itch," not his exposure to pepper spray some thirteen months earlier. Indeed, such arguments are counterintuitive since "OC use does not result in dermatitis, skin depigmentation, or burns." George Gkeneralis, Health Consequences of Large Scale Use of Tear Gases and Other Chemical Substances in Mass Gatherings as a Means of Law Enforcement, 7 (2012), http:crisis.med.uoa.gr/elibrary/6.pdf. Therefore, plaintiff's mere "allegations" of continuing injury fail to establish that the failure to give him a decontamination shower constituted more than a *de minimis* use of force.

agent and that such failure resulted in plaintiff seeking medical care for a long time thereafter due to "burning of the body[.]" (Doc. 1, at 9; *see also* Doc. 21, at 2 & 4-7.)

To prevail upon a claim of deliberate indifference to a serious medical need, an inmate must "shoulder three burdens." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).[17] First, he must establish the objective component by showing that he has a serious medical need. *Goebert*, 510 F.3d at 1326 (citation omitted). Next, he must establish the subjective component "by showing that the prison official acted with deliberate indifference" to his serious medical need. *Id.* (citation omitted). And, finally, he "must show that the injury was caused by the defendant's wrongful conduct." *Id.* (citation omitted).

As recognized in *Goebert, supra*, "[a] medical need that is serious enough to satisfy the objective component 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" 510 F.3d at 1326 (citation omitted). The subjective component "requires a showing that a prison official acted with deliberate indifference to the prisoner's serious medical need." *Goebert*, 510 F.3d at 1326. Deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

---

[17]     *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (when seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts), *cert. denied*, 531 U.S. 1077, 121 S. Ct. 774, 148 L. Ed. 2d 673 (2001).

inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994). In addition, a plaintiff must prove that the prison official disregarded the risk of serious harm by conduct that amounts to more than gross negligence. *Goebert*, *supra*, 510 F.3d at 1327 (citation omitted). This is because "deliberate indifference" entails more than mere negligence. *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003); *see also Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).

There is nothing in the evidence presented to this Court that even begins to suggest that Maddox was not treated on December 15-16, 2011, in the aftermath of his exposure to pepper spray,[18] nor is there any evidence suggesting that the plaintiff has suffered any kind of injury as a result of the defendants' failure to give plaintiff a decontamination shower. Indeed, there is no mention of plaintiff's alleged skin conditions in the medical records surrounding the spraying of Maddox with the chemical agent and Maddox's failure to comment about a burning anywhere on his body, other than to his eyes, to Nurse Nettles on December 16, 2011, speaks volumes that any alleged skin condition was not caused by the failure of the defendants to give him a decontamination shower.[19] Maddox did complain, hours after his exposure to the chemical agent, about blurring and burning of his eyes; however, evaluation by an infirmary nurse and an optometrist found nothing wrong with plaintiff's eyes as a result

---

[18]     Again, by plaintiff's own admission, it is undisputed that immediately after he was sprayed with pepper spray in the face, he was taken to the Health Care Unit where his eyes and face were cleaned and/or flushed. Moreover, even though the examining nurse noted no objective (or subjective) problems upon examination, following decontamination of the eyes and face, plaintiff was instructed to return to the Health Care Unit as needed.

[19]     Rather, as repeatedly pointed out by the Court, any skin problems plaintiff may have experienced were due to "jock itch," not "burning" of his skin due to the failure to afford him a decontamination shower.

of exposure to pepper spray. More specifically, plaintiff's vision did not change and no chemical side effects to his eyes were noted. Thus, the objective component of this claim is lacking. *Cf. Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) ("'[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm.'"). The third element is also missing because, again, there is no evidence of any injury caused to plaintiff by the action of the defendants in failing to ensure that he receive a decontamination shower. Thus, the defendants are entitled to summary judgment on this claim.

## CONCLUSION

In light of the foregoing discussion, the defendants' motion for summary judgment (Doc. 19; *see also* Doc. 20) is **GRANTED** and plaintiff's claims are **DISMISSED WITH PREJUDICE.**

Final judgment in accordance with this Order and Federal Rule of Civil Procedure 58 shall issue by separate document.

**DONE** and **ORDERED** this the 24th day of March 2014.

s/KRISTI K. DuBOSE
**UNITED STATES DISTRICT JUDGE**